ANTONIO MARTÍNEZ, Plaintiff and Appellee, *v.* GABINO MARTÍNEZ DÁVILA, Defendant and Appellant.

No. 11297. Argued May 2, 1955.—Decided May 6, 1955.

*Arturo Ortiz Toro* and *Manuel Abréu Castillo* for appellant. *Miranda Esteve* and *Martínez Álvarez* for appellee.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

This is an appeal taken by Gabino Martínez from a judgment rendered by the Superior Court ordering him to pay to Antonio Martínez the sum of $600 for damages, plus costs and $750 for attorney's fees. The trial court made the following findings of fact:

"1.—On May 18, 1951, plaintiff Antonio Martínez purchased a box of pastries in the pastry shop of defendant Gabino Martínez Dávila, which was and is established at De Diego Avenue, Río Piedras.

"2.—Among the pastries purchased by plaintiff were the so-called éclairs.

"3.—Other persons, besides plaintiff, purchased the same kind of pastry.

"4.—The pastry purchased by plaintiff was placed in a box which read: 'Repostería El Alcázar de Gabino Martínez.'

"5.—Plaintiff and other persons who ate the pastry were poisoned.

"6.—After eating the pastry, plaintiff got sick to his stomach and threw up, and in the evening of May 18–19, 1951 he voided his bowels more than normal. As a result of the vomiting and excessive defecation, his blood pressure went down, his perspiration was cold, and he was in a state of prostration, so that he was forced to stay in bed for two days.

"7.—That that evening he received medical treatment from Dr. Bernabé Lima Beaz, who visited him again two days later.

"8.—Pastry of the kind purchased by plaintiff was analyzed by the Health Department, which detected the presence of numerous aureohemolytic staphylococci.

"9.—Food contaminated with aureohemolytic staphylococci produces enterotoxin. This enterotoxin starts to develop eight hours after the food becomes contaminated.

"10.—When food contaminated with staphylococci is taken, the enterotoxin produces nausea, vomiting, and frequent defecation two or three hours after ingestion.

"11.—Among other persons poisoned by the pastry were a youngster, Rubén Antonio Villanueva, his mother, and his sister.

"12.—At the time the pastry was contaminated, defendant was not doing any baking in his shop but was selling the pastry baked by Andrés Vázquez.

"13.—That Hosmel Galán, an experienced baker, was at that time chief baker for the defendant. He was in charge of supervising the pastry, and there was no one besides him with sufficient experience to determine which pastry could be sold and which could not.

"14.—Hosmel Galán supervised the pastry made in the bakery but not that purchased from other bakeries.

"15.—He was never consulted as to the quality of the goods purchased. Defendant's wife was the person who decided when the pastry could not be sold, and when and how it could be sold.

"16.—According to her testimony, the éclairs should not be sold 12 hours after baking. They remain in good condition between 8 and 12 hours.

"17.—According to the testimony of Dr. Federico Hernández Morales and Lolita Lugo Daniels, the laboratory technician, the cream in the éclairs is an excellent culture for the class of bacteria found in the contaminated pastry, it being necessary to take special precautions to avoid contamination.

"18.—The enterotoxin sets in eight hours after contamination with staphylococci, which means that one of the possibilities is that any pastry containing cream, which is a suitable field for the cultivation of that bacteria, should be consumed within the first eight hours after baking. (See Dr. Hernández Morales' testimony.)

"19.—At 6:30 a.m. of May 18, Ángel Ortiz purchased an éclair in Juan Hernández's shop, which was also supplied by Andrés Vázquez. He was also poisoned by eating the pastry.

Although purchased in a shop other than defendant's, it was one of the same pastry sold by the defendant. If the éclairs were contaminated at 6:30 a.m., evidently they had been baked before that time. If the éclairs which Ángel Ortiz ate was already contaminated at 6:30 a.m., the virulence of a poisoning produced 11 hours later by the same or similar pastry must necessarily be greater.

"20.—Since the enterotoxin which causes the poisoning sets in eight hours after contamination, evidently by 6:30 a.m. the pastry was contaminated eight hours before. It would have been easy for the defendant to find out about the baking process as well as the time at which the pastry sold was baked, since according to Andrés Vázquez' testimony his bakery shop adjoins, in the rear, defendant's business."

■ Appellant assigns five errors in his brief. In the first he contends that plaintiff failed to establish at law or by the evidence an action for damages against him. Besides making a groundless attack on the probative force of plaintiff's evidence, he maintains that it was not proved that plaintiff was poisoned with the éclairs which he purchased from the defendant. He relies on the fact that neither plaintiff's vomit nor diarrhea was analyzed for the purpose of determining the cause thereof. This question has already been decided adversely to him in *Castro* v. *Payco, Inc.*, 75 P.R.R. 59, and *Lydia Armstrong* v. *Gabino Martínez, per curiam* decision of April 19, 1955. In those cases, as well as in the instant case, there was sufficient additional evidence to support the trial court's conclusion that the poisoning suffered by plaintiff was produced by the éclairs purchased in defendant's shop.

■■ In the second and fourth assignments appellant contends that the seller is not responsible for the sale of products not manufactured by him, and that, therefore, the "implied-warranty" doctrine does not apply here. This question was also decided adversely in *Armstrong* v. *Martínez, supra*.

■ The third assignment deals with the applicability

of Act No. 72 of 1940 (Sess. Laws, p. 492) to actions for damages such as that brought by plaintiff-appellee. In the *Castro* case, *supra,* we considered that Act. We need not repeat here what we stated there. Appellant's defense cannot be predicated on his ignorance of the condition of the pastry sold to appellee. The error was not committed.

■ Neither was the fifth and last error. There is evidence in the record to uphold the trial court's conclusion that defendant-appellant was obstinate, wherefore the award of attorney's fees was proper. The sum awarded on this account is not unreasonable. See *Castro* v. *Payco, Inc., supra.*

The judgment will be affirmed.